WINSLOW BROS. & SMITH CO. *vs.* HILLSBOROUGH MILLS.

Suffolk. November 5, 1945. — February 1, 1946.

Present: FIELD, C.J., LUMMUS, RONAN, & SPALDING, JJ.

*Price Control. Statute,* Construction. *Sale,* Contract of sale, Warranty. *Contract,* Construction. *Words,* "Clean basis."

At the trial of an action for the purchase price of wool sold "in the grease," it was proper for the trial judge to resort to evidence of the customs and practices of the wool trade in determining the meaning of the words "clean basis" as used in a regulation of the Office of Price Administration requiring that the maximum price of wool of that type should be a certain sum per pound on a "clean basis."

No error of law was disclosed in conclusions by a trial judge, based solely on his subsidiary findings, that a regulation of the Office of Price Administration that the maximum price for wool "in the grease" should be a certain sum per pound on a "clean basis" was complied with, where the parties to a sale of wool in the grease to a worsted mill agreed upon a price computed by making a deduction from such specified maximum price of a certain percentage based upon their estimate made in good faith of the shrinkage which would result from scouring, but not upon the further shrinkage which might result from combing after scouring, and that the price so computed should be the final price not subject to adjustment even though the actual shrinkage should exceed the estimated shrinkage.

No error appeared in a ruling by a judge, hearing an action involving the question whether a regulation of the Office of Price Administration had been complied with, that there was nothing conclusive or binding upon him in informal opinions of subsidiary officials of the Office of Price Administration which had been rendered to one of the parties to the action after the controversy between the parties had arisen.

A sale of wool "in the grease" at a stated price, computed as a percent-

age of a price set by the Office of Price Administration on a "clean basis" and based on a shrinkage which the parties in good faith estimated would result from scouring, did not include a warranty that the shrinkage would not be greater than their estimate.

CONTRACT. Writ in the Superior Court dated March 1, 1944.

The case was heard by *Cabot*, J.

*W. Powers*, for the defendant.

*J. Sidney Stone*, (*T. L. Gannon* with him,) for the plaintiff.

SPALDING, J. This is an action of contract in which the plaintiff seeks to recover a balance of the purchase price alleged to be due on a sale and delivery by it to the defendant of three hundred bales of wool. The plaintiff has been paid $91,628.30, but alleges that the defendant owes it a balance of $3,837.61 with interest. The defendant contends, for reasons that will be discussed later, that it not only owes the plaintiff nothing but that the plaintiff has been overpaid to the extent of $2,694.94, the recovery of which with interest the defendant seeks under its declaration in set-off.

The case was tried to a judge whose findings of facts may be summarized as follows: The plaintiff is a wool dealer in Boston and acts as a selling agent for Armour & Co., hereinafter called Armour. The defendant operates a worsted mill at Wilton, New Hampshire, in which it manufactures worsted yarn, a fact known to the plaintiff, and uses both shorn and pulled wool. Wool that is shorn from live sheep is known as "shorn wool" or "fleece wool." Wool that is pulled from the hides or carcasses of sheep after they have been slaughtered is known as "pulled wool." Both "shorn wool" in the condition in which it comes from the sheep and "pulled wool" after coming from the "pullery" are known as greasy wool or wool in the grease. Such wool varies from lot to lot as to the amount of foreign substance and grease that it contains, consequently the shrinkage after scouring is not uniform. The ultimate commercial value of a lot of greasy wool depends upon the amount and quality of clean wool obtained after scouring. Scouring consists of washing the wool with soap or alkali and hot water. Greasy wool, whether it is to be used in a worsted mill or in a woolen

mill, has to be scoured first. In a worsted mill the wool is combed after it is scoured, whereas in a woolen mill it is merely carded. Where wool is combed after scouring additional foreign matter is removed, consequently there is a greater shrinkage than there would be where it is merely scoured and carded.

On April 13, 1943, representatives of the defendant examined a sample of Armour's pulled wool in the grease, weighing about three to five pounds, at the plaintiff's office in Boston. The parties agreed upon the sale of three hundred bales of such wool, if available from Armour. It was agreed that the wool "was 64s and 2½ inches long and of choice character." (The maximum price prescribed by the regulations of the Office of Price Administration, [1] hereinafter called the OPA, for wool of this type was at that time $1.23 per pound on a "clean basis.") It was further agreed that the price would be the maximum or "ceiling price" of $1.23 per pound "clean basis," and they agreed in good faith that a fair estimate of the shrinkage would be twenty-eight per cent and that the grease price would be $.8856 per pound "f.o.b. Chicago." "This figure was arrived at by taking the ceiling price of $1.23 clean basis, estimating a twenty-eight per cent shrink, and, therefore, taking seventy-two per cent of the $1.23 ceiling."

Thereafter three hundred bales of wool (weighing one hundred seven thousand seven hundred ninety-eight pounds), of the type and quality contemplated by the agreement, were shipped to and received by the defendant. The sales memoranda forwarded to the defendant recited that the sales were "subject to any government regulations." For the wool shipped the defendant was charged $95,465.91, which was based on a grease price of $.8856 per pound. After the wool had been scoured and combed, the yield showed a shrinkage of thirty-three per cent. There was no evidence before the judge as to the actual shrinkage after scouring alone.

The principal question for decision in the trial court was

---

[1] See emergency price control act of 1942, 56 U. S. Sts. at Large, 23.

the meaning of the words "clean basis" as used in the OPA regulations. The defendant contends that the "clean basis" ceiling refers to the ultimate weight that wool, delivered in the grease to the purchaser, will have after it has been cleaned; that the cleaning process for a worsted mill such as it operates includes both scouring and combing; and that the ultimate weight to which the ceiling applies is the weight of the clean wool, after both scouring and combing. It therefore argues that the grease price agreed upon by the parties at the time of the sale, which was based upon an estimated shrinkage of twenty-eight per cent, was subject to a later adjustment on the basis of the actual shrinkage after scouring and combing; and that by computing the price on the actual shrinkage the wool should have been billed at $.8250 per pound, instead of $.8856, in order to conform to the $1.23 ceiling. If the defendant's contention is correct, it would owe the plaintiff nothing and would be entitled to recover the amount claimed in its declaration in set-off.

The plaintiff's position is in substance this: The term "clean basis" as applied to a sale of wool in the circumstances here disclosed contemplates scouring but not combing. But even then it does not matter what the weight of the scoured wool actually proves to be. All that is required is an estimate, made in good faith by the parties at the time of the sale, of the scouring shrinkage. The price determined on the basis of this estimated shrinkage is binding on the parties and is not subject to later adjustment in the event the actual shrinkage after scouring exceeds the estimate.

The judge adopted the view urged by the plaintiff and in effect ruled [1] that the agreed price of $.8856 per pound for the wool in its greasy state based upon a shrinkage of twenty-eight per cent estimated in good faith by the parties was a compliance with the ceiling price fixed by the OPA regulations. He found for the plaintiff in the sum of $4,147.38 and for the same party as defendant in set-off on the declaration in set-off, and reported the case to determine whether his findings were warranted as a matter of law under the applicable OPA regulations.

---

[1] See footnote 2, p. 142.

Where an action at law comes to this court, as here, by report, the decision of the court below upon questions of fact is not open to revision here; only questions of law are presented. *Churchill* v. *Palmer*, 115 Mass. 310, 313. *Atlantic Maritime Co.* v. *Gloucester*, 228 Mass. 519, 522. *Scaccia* v. *Boston Elevated Railway*, 308 Mass. 310, 314. For the rule in equity see *Electric Welding Co. Ltd.* v. *Prince*, 200 Mass. 386, 392. The report recites that the ultimate findings of the judge were based solely on his subsidiary findings. Thus, if the subsidiary findings with the permissible inferences therefrom were sufficient as matter of law to support the ultimate findings, those findings must stand. *Gilbert* v. *Beacon Hill Credit Union*, 287 Mass. 433, 436.

In determining the meaning of the regulations in fixing the ceiling price on a "clean basis" for wool sold in the grease, the judge made extensive findings with respect to the customs and practices of the trade existing prior to the adoption of the regulations. These findings in substance were that the expression "clean basis" price, when used with reference to a purchase and sale of wool in the grease, meant a price based upon an estimate by the parties of what the value of the greasy wool would be when it had been scoured; and that this of necessity involved an estimate of the shrinkage, which meant shrinkage after scouring rather than shrinkage after scouring and combing. "Therefore in a sale on 'clean basis' the agreed price, even though necessarily based upon an estimate by both parties is understood to be the actual sale price."

As an aid to construing the regulations under consideration, the judge was warranted in resorting to the customs and practices of the wool trade. "Each trade has its peculiar jargon and courts rely on that jargon when it finds its way into a statute dealing with that trade." *Hoffman* v. *Palmer*, 129 Fed. (2d) 976, 984. *O'Hara* v. *Luckenbach Steamship Co.* 269 U. S. 364. *Carter* v. *Liquid Carbonic Pacific Corp. Ltd.* 97 Fed. (2d) 1, 3. See *Hedden* v. *Richard*, 149 U. S. 346, 348, 349; *Ex parte Hall*, 1 Pick. 261. That the words "clean basis" were to be construed in accordance with the understanding of that expression in the wool trade finds

further support in the provision in the emergency price control act of 1942 (§ 2 [h]; 56 U. S. Sts. at Large, 23, 27 [1]) to the effect that the powers granted the price administrator "shall not be used or made to operate to compel changes in the business practices, cost practices or methods, or means or aids to distribution, established in any industry, except to prevent circumvention or evasion of any regulation, order, price schedule, or requirement under this Act."

There is no merit in the defendant's contention that the trial judge merely assumed, without deciding, that there was no violation of the applicable regulations. [2] The findings read as a whole clearly establish that the trial judge did not merely assume, but actually found, that there was no violation of the regulations. Also without merit is the defendant's contention that the judge made no findings as to the meaning of the words "clean basis" as used in the regulations. We think that the findings, fairly construed, indicate that the judge understood that this was one of the principal questions in the case, and that his detailed findings as to the meaning of the words in the wool trade were intended to shed light on their meaning in the regulations.

Prior to the commencement of the present action many letters were exchanged between the defendant and the offices of the OPA in Concord, New Hampshire, and Boston in an effort to obtain an interpretation of the words "clean basis" as used in the regulations, and these were introduced in evidence. The contents of this correspondence need not be recited. It is enough for present purposes to say that the defendant received several letters from various regional price officers and attorneys which contained interpretations (by no means consistent or uniform) of the regulations by the Boston and Washington offices of the OPA. In making his findings the trial judge ruled that there was nothing in these letters that was conclusive or binding on him.

[1] See now 58 U. S. Sts. at Large, 632, 635; U. S. C. (1940 ed.) Sup. IV, Title 50, Appendix, § 902 (h).

[2] This contention is predicated on a statement by the judge in his findings that they were made "on the assumption that an agreed price of $.8856 per pound for the wool in its greasy state based upon an estimated shrink of twenty-eight per cent made in good faith by the parties was a compliance with the OPA regulations."

This ruling was right.  Whatever may be the effect of formal and published interpretations, by the administrator of the OPA, of regulations promulgated by him (see *Overnight Motor Transportation Co. Inc.* v. *Missel*, 316 U. S. 572, 580, footnote 17; *Bowles* v. *Seminole Rock & Sand Co.* 325 U. S. 410; *Goodman* v. *Bowles*, 138 Fed. [2d] 917, 919; *Bowles* v. *Nu Way Laundry Co.* 144 Fed. [2d] 741, 746; *Bowles* v. *Simon*, 145 Fed. [2d] 334, 337; *Consolidated Water Power & Paper Co.* v. *Bowles*, 146 Fed. [2d] 492, 494), those here fell far short of that.  They amounted to nothing more than the informal opinions of subordinate officials, rendered to one of the parties after the controversy in question arose. See *Bowles* v. *Ammon*, 61 Fed. Sup. 106, 113, 114; *Bowles* v. *Simon*, 145 Fed. (2d) 334.

What has been said disposes of the defendant's contention that there was a breach by the plaintiff of both express and implied warranties that the shrinkage would not exceed twenty-eight per cent.  According to the findings both parties agreed that the sale was to be at the OPA ceiling price on a "clean basis."  A sale on that basis did not include any warranty that the shrinkage would not exceed twenty-eight per cent.

Since no error of law is disclosed in the report, judgment is to be entered in accordance with the judge's findings.

*So ordered.*